# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of <br> Room #104 of the America's Best Value Inn, 7222 Rosemead Blvd. in Pico Rivera; a white Infiniti G35, bearing California license plate #6FMJ185; a white Mercedes E350, bearing California license plate #7BVY136; and the person of Hovanes Sungulyan, further described in Attachments A-1 - A4 | ) ) ) ) ) ) ) ) Case No. 2: 20-MJ-03817 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| *See Attachment B* | *See Attachment B* |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u> _____     Hon. Karen L. Stevenson , U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Jason C. Pang, x2652

## ATTACHMENT A-1

PREMISES TO BE SEARCHED

The premises known as Room #104 of the America's Best Value Inn, located at 7222 Rosemead Blvd., Pico Rivera, California 90660 (the "SUBJECT PREMISES"), which consists of a hotel room.

Rosemead Blvd. runs North, South.  The SUBJECT PREMISES is located within a building on the East side of Rosemead Blvd., at the intersection with Danbridge St.  The building is a light tan with red tile roofing and green and red trim.  The doors to the rooms are also red.  The SUBJECT PREMISES is located on the ground floor of the building.  The front door to the SUBJECT PREMISES is located on the exterior of the building facing north toward Danbridge St.  The numbers 104, in light color against a dark placard, are affixed to the top center of the door of the SUBJECT PREMISES.

The SUBJECT PREMISES includes any appurtenances, outbuildings, garages, sheds, carports, storage facilities, and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, boxes, cans, bags, purses, trash cans, and other grounds assigned to Room #104 of the America's Best Value Inn, located at 7222 Rosemead Blvd., Pico Rivera, California 90660.

i

## ATTACHMENT A-2

PREMISES TO BE SEARCHED

    A white Infiniti G35, bearing CA license plate 6FMJ185 ("SUBJECT VEHICLE 1").

## <u>ATTACHMENT A-3</u>

<u>PREMISES TO BE SEARCHED</u>

A white Mercedes E350, bearing CA license plate 7BVY136 ("SUBJECT VEHICLE 2").

## **ATTACHMENT A-4**

<u>PERSON TO BE SEARCHED</u>

The person of Hovanes SUNGULYAN ("SUNGULYAN"), date of birth February 24, 1987, with California Driver's License Number D6532444.  SUNGULYAN's California Department of Motor Vehicle records lists him as standing 5 feet and 8 inches tall with brown hair and brown eyes.

The search of SUNGULYAN shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within SUNGULYAN's immediate vicinity and control at the location where the search warrant is executed.  The search shall not include a strip search or a body cavity search.

**ATTACHMENT B**

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances)(the "Subject Offenses"), namely:

        a.   Any controlled substance, controlled substance analogue, or listed chemical;

        b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

        c.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

        d.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or

transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

  e. Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

  f. Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

  g. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

  h. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook,

Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

      i.    Audio recordings, pictures, video recordings, or
still captured images related to the purchase, sale,
transportation, or distribution of drugs;

      j.    Contents of any calendar or date book;

      k.    Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations; and

      l.    Any digital device which is itself or which
contains evidence, contraband, fruits, or instrumentalities of
the Subject Offenses, and forensic copies thereof.

      m.    With respect to any digital device containing
evidence falling within the scope of the foregoing categories of
items to be seized:

         i.   evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,
browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

         ii.  evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,

iii

as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii. evidence of the attachment of other devices;

    iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    v.   evidence of the times the device was used;

    vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

    vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

    viii.    records of or information about Internet Protocol addresses used by the device;

    ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

  2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.    In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime

was encountered, including how it was immediately apparent contraband or evidence of a crime.

    d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

    e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

    f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

    g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

    h.   After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel

assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Hovanes SUNGULYAN's thumb- and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Hovanes SUNGULYAN's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

<u>**AFFIDAVIT**</u>

I, Reese Stewart, being duly sworn, declare and state as
follows:

**I.  <u>PURPOSE OF AFFIDAVIT</u>**

1.    This affidavit is made in support of an application
for a warrant to search: (1) Room #104 of the America's Best
Value Inn, 7222 Rosemead Blvd., Pico Rivera, California 90660
(the "SUBJECT PREMISES") as described more fully in Attachment
A-1, (2) a white Infiniti G35, bearing California license plate
#6FMJ185 ( "SUBJECT VEHICLE 1") as described more fully in
Attachment A-2, (3) a white Mercedes E350, bearing California
license plate #7BVY136 ( "SUBJECT VEHICLE 2") as described more
fully in Attachment A-3; and (4) the person of Hovanes SUNGULYAN
("SUNGULYAN") as described more fully in Attachment A-4.

2.    The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of violations of 21
U.S.C. § 841(a)(1) (possession with intent to distribute and
distribution of controlled substances) and 21 U.S.C. § 846
(conspiracy and attempt to distribute controlled substances)
(the "Subject Offenses"), as described more fully in Attachment
B.  Attachments A-1, A-2, A-3, A-4, and B are incorporated
herein by reference.

3.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrant,

and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.   I am an investigator or law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of, and to make arrests for, narcotics trafficking and money laundering violations under Titles 18 and 21 of the United States Code.

5.   I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and have been so employed since June 2019.  I am currently assigned to DEA's Los Angeles Field Division ("LAFD"), Enforcement Group 2, which investigates narcotics trafficking and money laundering violations under Titles 18 and 21 of the United States Code.  I have received 16 weeks of specialized training in Quantico, Virginia, pertaining to narcotics trafficking, money laundering, undercover operations and electronic and physical surveillance procedures.

6.   Before becoming a Special Agent, I was employed as a Border Patrol Agent with the United States Border Patrol from March 2008 to December 2011.  As a Border Patrol Agent, I conducted law enforcement duties pertaining to narcotics and human smuggling along the border between the United States and Mexico.  In December 2011 I became a Deportation Officer with Immigration and Customs Enforcement, in which I conducted

2

immigration and firearms investigations.  From June 2017 to June 2019, I was assigned as a Task Force Agent with the Drug Enforcement Administration, in which I participated in narcotics investigations.

7.    Throughout my career as a federal agent, I have received numerous hours of training in narcotics investigations, investigative techniques, surveillance, and evidence collection. I have been the case agent and co-case agent for investigations involving narcotics trafficking in the Southern California area. These investigations have focused on narcotics distribution, the laundering of narcotics proceeds and monetary instruments derived from narcotics activities, and conspiracies associated with narcotics offenses.  I have debriefed defendants, informants, and witnesses who have personal knowledge regarding narcotics trafficking organizations.  I have participated in narcotics investigations, including Title III wire interceptions, of numerous individuals involved in the distribution, possession, and manufacture of controlled substances, such as cocaine, methamphetamine, marijuana, fentanyl, heroin, and oxycodone.  I have also participated in the execution of search and arrest warrants involving drug trafficking crimes.

8.    I have learned that narcotics trafficking organizations utilize numerous individuals/co-conspirators each serving different functions and each possessing only a limited knowledge of the workings of their organization and the identity and the role of the co-conspirators.  In this way the

organization can limit the damage done to the overall operation
should one or more of its members be apprehended.  It also
protects those persons who are responsible for the overall
direction and operations of the organization against arrest
and/or successful prosecution.  I also know individuals involved
in narcotic trafficking organizations utilize the names of
others or non-existent individuals to purchase or rent vehicles
for the use in the distribution of narcotics; to purchase or
rent residences, hotel rooms, businesses, and/or storage
facilities to be used in the storage of narcotics and the
proceeds of their sales.  This false identifying information is
also used to purchase or rent digital pagers and cellular
telephones to be used in the furtherance of narcotics
transactions and in the subscription of utilities and other
services.

9.    Through my training, experience, and interaction with
experienced SAs, Task Force Officers ("TFOs"), and other
narcotics investigators, I have become familiar with the methods
employed by narcotics traffickers, in particular, practices to
smuggle, safeguard, transport, and distribute narcotics, and to
collect and launder narcotics-related proceeds.  These methods
include the use of debit calling cards, public telephones,
wireless communications technology (such as paging devices and
cellular telephones), counter-surveillance, elaborately planned
smuggling schemes tied to legitimate businesses, false or
fictitious identities, and coded or encrypted communications, in
an attempt to avoid detection by law enforcement and to

circumvent narcotics investigations.  I know that during the
course of these wire and electronic communications, organization
members routinely use coded references and/or encryption in an
effort to elude law enforcement detection; that narcotics
traffickers often confine their illegal telephonic
communications to well-trusted organizational members and other
high-level narcotics traffickers; that, in order to minimize
telephonic communications, traffickers often conduct "in person"
meetings at secure locations; and that, a trafficking
organization will typically maintain or have knowledge of one or
more locations which can be used by members to conduct secure,
private conversations in furtherance of their conspiracy.

10.  Based on my training and experience, I know that
records are often maintained by drug traffickers.  Further, drug
traffickers in many instances will, out of necessity, perform
record keeping.  This allows them to keep track of amounts paid
and owed, such records will be maintained close at hand so as to
readily ascertain current balances for money owed/paid.

11.  It is also a common practice for traffickers to
conceal large sums of money at their residences, either the
proceeds from their drug sales/monies to be used to purchase
controlled substances or items associated with the production of
controlled substances.  In this connection, drug traffickers use
wire transfers, cashier's checks, money orders, and cash to pay
for their controlled substances.  Evidence of such financial
transactions and records relating to income and expenditures of

money and wealth in connection with drug trafficking would also typically be maintained in residences.

12. Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the drug traffickers profits and/or supply of drugs.

### III. SUMMARY OF PROBABLE CAUSE

13. On February 20, 2020, a Confidential Source[1] (hereafter "CS") working for the DEA purchased approximately 20 counterfeit, 30 milligram (mg) blue Oxycodone pills containing fentanyl from SUNGULYAN for $320 in Rosemead, California. SUNGULYAN met with the CS to sell the pills while driving SUBJECT VEHICLE 1.

14. On June 30, 2020, while acting in an undercover capacity, I purchased approximately 31 counterfeit, blue Oxycodone pills containing fentanyl from SUNGULYAN in the parking lot at a Walmart retail store, located at 8500 E. Washington Blvd. in Pico Rivera, California, for $400. SUNGULYAN met with me to sell the pills while driving SUBJECT VEHICLE 2.

15. On August 5, 2020, while acting in an undercover capacity, I purchased approximately 57 counterfeit, blue

---

[1] CS has been cooperating with the DEA since 2015. The CS has no prior criminal convictions. During the course of the CS's cooperation, the CS has provided valuable actionable information regarding several narcotics traffickers operating in the greater Los Angeles area. The information provided by the CS has been corroborated by law enforcement to the extent possible, and to my knowledge, the CS has not provided information to law enforcement that has been proven to be false or misleading.

Oxycodone pills containing fentanyl from SUNGULYAN for $500 at
the America's Best Value Inn, 7222 Rosemead Blvd. Pico Rivera,
CA 90660 (the "Inn," which contains the hotel room that is the
SUBJECT PREMISES).  During that meeting, SUNGULYAN and I
discussed conducting a future drug transaction involving 500
pills, which would take place at the Inn.

16.  On August 11, 2020, law enforcement conducting
surveillance saw SUNGULYAN arrive to the Inn in SUBJECT VEHICLE
1 and enter the SUBJECT PREMISES.  Law enforcement then saw
SUNGULYAN enter and exit the SUBJECT PREMISES and conduct what
they believe to be hand-to-hand drug transactions.

17.  On August 12, 2020, law enforcement saw SUNGULYAN at
the Inn, and SUBJECT VEHICLE 1 in the parking lot of the Inn.

18.  On August 12, 2020, acting in an undercover capacity,
I texted SUNGULYAN to arrange to purchase 500 pills for $4000 on
August 13, 2020.  SUNGUYLAN responded by text message to confirm
that he would sell me 500 pills on August 13, 2020 at the Inn.
During the evening of August 12, 2020, law enforcement
conducting surveillance saw SUNGULYAN exit the SUBJECT PREMISES.

## IV. STATEMENT OF PROBABLE CAUSE

19.  Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

### A.    February 2020 Controlled Buy of 20 Fentanyl Pills

a.    In February 2020, DEA discovered an advertisement
on the website, www.craigslist.org ("Craigslist"), of "Blue
Roxies" in size 30 M for sale.  Through my training and

experience, I understand "Blue Roxies" in size 30 M to be coded language used by drug traffickers to describe counterfeit 30 mg blue Oxycodone pills that contain fentanyl.  I also know that Craigslist is frequently used by narcotics traffickers to covertly sell narcotics, including counterfeit prescription drugs.

        b.   On February 20, 2020, law enforcement contacted the Craigslist advertiser to purchase 20 "Blue Roxies" for $320. The advertisement provided the contact number (562)205-8855. (562)205-8855 is a Voice Over IP ("VOIP") telephone number and did not contain subscriber information which identified the user.  Based on my training and experience, I know drug traffickers use VOIP telephone numbers to conceal their identities from law enforcement.  The CS travelled to the intersection of Graves Avenue and Jackson Avenue in Rosemead, California, where he met SUNGULYAN and purchased the 20 "Blue Roxies." SUNGULYAN arrived at the intersection of Graves Avenue and Jackson Avenue in Rosemead, California, in SUBJECT VEHICLE 1, which is registered to SUNGULYAN.  Based on the registration, law enforcement pulled SUNGULYAN's California driver's license record.  The CS confirmed he purchased 20 "Blue Roxies" from SUNGULYAN after seeing a copy of SUNGULYAN's California driver's license picture.  Based on a field test, a sample of the purchased "Blue Roxies" tested positive for fentanyl.

**B.   June 2020 Controlled Buy of 31 Fentanyl Pills**

        c.   In June 2020, I discovered another advertisement on Craigslist of "Blue Roxies" in size 30 M for sale.  The

advertisement listed that the seller was located in the Rosemead, California area, and listed a contact number (562)205-8855 – the same number used by SUNGULYAN during the controlled purchase of 20 "Blue Roxies" to the CS in February 2020.  Acting in an undercover capacity, I contacted SUNGULYAN to purchase 30 "Blue Roxies" for $400.00 on June 30, 2020.  On that day, SUNGULYAN directed me to call him at telephone number (323)365-3778, an AT&T number subscribed to Mariam Sungulyan.  On a phone call, SUNGULYAN told me, in part and in substance:

       i.    SUNGULYAN would be within 5-7 minutes of a Walgreens store located at 8900 E. Washington Blvd. Pico Rivera, CA 90660;

      ii.   SUNGULYAN directed me to meet with him at the Inn;

   iii.  SUNGULYAN stated he had a room at the Inn; and

    iv.  SUNGULYAN stated that all of his customers know to meet him at the Inn.

     d.   As I travelled to meet SUNGULYAN, I instructed SUNGULYAN to meet me in the parking lot at the Walmart retail store, located at 8500 E. Washington Blvd. in Pico Rivera, California, instead.  SUNGULYAN arrived driving SUBJECT VEHICLE 2, which is registered to Sarkis Sungulyan.  I recognized him based on a copy of his California driver's license picture.  At that meeting, SUNGULYAN sold me 31 pills for $400.  Following the sale, law enforcement saw SUNGULYAN drive back to the Inn, where he parked SUBJECT VEHICLE 2.  Law enforcement did not see

which room SUNGULYAN entered into at the Inn at that time, but
they saw him walking back and forth from the Inn to the SUBJECT
VEHICLE 2.  Based on a field test, a sample of the purchased
"Blue Roxies" tested positive for fentanyl.

**C.   August 5, 2020 Controlled Buy of 57 Fentanyl Pills**

e.   On August 5, 2020, I texted SUNGULYAN at
(562)205-8855 to purchase 50 "Blue Roxies" for $500.  SUNGULYAN
responded that he was not currently in the Pico Rivera area but
could meet with me after he went back to the Pico Rivera area to
get the pills.  SUNGULYAN also texted me a photograph of five
separate plastic trays containing various shades of round blue
pills, and he asked which color I wanted.  Based on my training
and experience, I believe the various pills to be counterfeit
Oxycodone pills, suspected to contain fentanyl.  I informed
SUNGULYAN that I wanted the same pills from the last drug
transaction, referring to the purchase in June 30, 2020.
SUNGULYAN directed me to meet him at the Inn.

f.   Prior to the transaction, law enforcement saw
SUNGULYAN enter the Inn, but again were not able to determine,
at that time, which room SUNGULYAN entered.  Law enforcement
then saw SUNGULYAN leave the Inn to meet me on the street to
conduct the drug transaction.  The time between SUNGULYAN
arriving at the Inn and leaving to conduct the transaction was
approximately 20 minutes.  Based on this, I believe SUNGULYAN
needed that time to count out the pills from a possible supply
kept in his hotel room.  At that time, SUNGULYAN sold me 57
pills for $500.  During the meeting, SUNGULYAN and I discussed

conducting a future drug transaction involving 500 pills for
$4000.  SUNGULYAN agreed to conduct the deal at the Inn the
following week.  The purchased pills have not yet been lab
tested but are believed, based on my training and experience and
my prior purchases from SUNGULYAN, to contain fentanyl.
Following the drug transaction, law enforcement saw SUNGULYAN
walk back toward the Inn but were not able, at that time, to
identify SUNGUYLAN's room.

> **D.   August 13, 2020 Controlled Buy of 500 Fentanyl Pills**

g.   On August 11, 2020, law enforcement conducted
surveillance at the Inn and saw SUNGULYAN arrive in SUBJECT
VEHICLE 1.  After exiting SUBJECT VEHICLE 1, law enforcement saw
SUNGULYAN enter room 104 of the Inn (i.e., the SUBJECT
PREMISES).  Law enforcement then saw SUNGULYAN exit the SUBJECT
PREMISES and conduct at least two brief hand-to-hand exchanges
with other individuals, which I believe to be drug transactions.
Based on my training and experience, I know these types of
exchanges are meant to be covert and brief in nature in order to
evade law enforcement detection.  Following the transactions,
law enforcement saw SUNGULYAN re-enter the SUBJECT PREMISES.

h.   On August 12, 2020, I texted SUNGULYAN at
(562)205-8855 to arrange to purchase 500 "Blue Roxies" for
$4000.  On August 12, 2020, SUNGUYLAN responded via text message
to confirm that he would meet me on August 13, 2020, at the Inn,
and sell me 500 pills.

i.   On August 12, 2020, at approximately 6:48 in the evening, law enforcement conducted surveillance at the Inn and again saw SUNGUYLAN exit the SUBJECT PREMISES.

## V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

20.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences, vehicles, and other locations they frequent such as stash houses or hotel rooms.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This

includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

       d.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence, vehicles, and other locations they frequent such as stash houses or hotel rooms. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

       e.  Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

       f.  Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences, vehicles, and other locations they frequent such as stash houses or hotel rooms.

13

g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence, vehicles, and other locations they frequent such as stash houses or hotel rooms, including in safes.  They also often keep other items related to their drug trafficking activities at their residence, vehicles, and other locations they frequent such as stash houses or hotel rooms, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence, vehicles, and other locations they frequent such as stash houses or hotel rooms, even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

21.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units;

know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

     a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

     b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently

---

desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    22.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of

16

electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

23.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked

17

for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

        c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SUNGULYAN's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of SUNGULYAN's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

24.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

18

## VII. <u>CONCLUSION</u>

25.  For all of the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachments A-1, A-2, A-3, and A-4.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
_____, 2020.

_____
THE HONORABLE KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE